thank you, your honor. May it please the court. My name is Jeff Girola for the plaintiffs. There are a number of reasons why the court should reverse the judgment, but today I'd like to focus on three issues in particular. Taking those in order, it's one, the Song-Beverly Act, two, the Consumers Legal Remedies Act or CLRA, and three, the trial court's reduction of the jury's punitive damages award. The first two of those require us to look at the plain language of a couple statutes, and the third is governed by a uniform body of case law that governs a trial court's power to disturb a jury's punitive damages verdict. So beginning with the Song-Beverly Act, the Song-Beverly Act establishes that in order to be merchantable in California, which basically means in order to be legal to sell in California, all products have to meet four, each of four co-equal statutory requirements. One of those requirements is that it conform to the promises or affirmations of fact on the label. Now in this case, we're dealing with vehicles that were labeled as being of a certain quality, certain emissions output, when in reality those labels were fraudulently affixed, contained deliberately falsified information, and these cars in fact did not comply with federal or state emissions regulations. Based on the plain language of the statute, that means they were not merchantable as a matter of law. Now the trial court felt otherwise. The trial court found that there was a core test of merchantability, and that that core test is fitness for ordinary use. But if you look at the statute, fitness for ordinary use is one of the four co-equal requirements, and it is not a, excuse me, nothing in the statute, nothing in the plain text of the statute, elevates fitness for ordinary use to the status of a core test. Instead, fitness for ordinary use is one of the four co-equal requirements that each must be satisfied. Mr. Garreau, let me interject a question, please. That is, do we have a Ninth Circuit case law in which our court has said what we think the test for merchantability is? There is, Your Honor. One of the cases cited is Birdsong v. Apple, but it's important to think about, to look at those cases that are saying that the core test of merchantability is fitness for ordinary use, because the cases that say that are cases that involve allegations under that prong, specifically fitness for ordinary use. Birdsong is one such case. There was no mislabeling alleged in Birdsong. They were alleging a fundamental defect of earbuds, Apple earbuds. Now, it's true that there are some, that these do trace back to California cases saying the same thing, but each of those cases also was not dealing with mislabeling. Okay, so your view is that we could rule for you without the case going in bank? That's correct, because this would not be overturning Birdsong, because Birdsong was specifically a case brought under that that fitness for ordinary use prong and didn't involve mislabeling at all. That's correct. Okay, thank you. Of course. Now, there are, I should say, even assuming that the trial court was correct, even assuming that fitness for ordinary use is the core test of merchantability, plaintiffs offered evidence creating a tribal issue on that fact as well. I think the key case here is Brand v. Hyundai. Now, that is a case in which the Court of Appeal held that it's not immediate danger to the driver or a non-functioning vehicle, but even, but lack of fitness for ordinary use also includes creating a substantial health risk for the general public. Now, in this case, we have vehicles that we're putting out up to 40 times the amount of nitrous oxide allowable in California, and we had evidence submitted at the summary judgment stage that shows a litany of deleterious health effects associated with heightened carbon monoxide, excuse me, nitrous oxide, which is on its own enough for a jury to have concluded that under Brand, that creates a substantial health hazard to the general public. So, even assuming the trial court was correct about this core test, which again, on the plain language of the statute, is frankly not a defensible reading of the statute, it's nonetheless, it was nonetheless erroneous in granting summary judgment based on the evidence that was before it. If there are no further questions on this issue, I'd like to talk to you about the Consumers Legal Remedies Act. The CLRA allows plaintiffs to sue for damages, and when they do, they have to send a pre-lawsuit demand to the defendant. Now, this whole procedure is governed by, again, the plain language of the statute, and that plain language says that when they, when they send that demand, there's a 30-day timer that starts running, and the defendant has 30 days within which to correct the problem or agree to the demand by promising to correct the problem within a reasonable time. It's called an appropriate correction. Now, in this case, Volkswagen didn't respond at all to two plaintiffs, responded after 30 days to another, and then responded, but didn't make any offer of correction of any kind, to the remaining three. So, first and foremost, Volkswagen failed to avail itself, based on the plain terms of Section 1782, Subdivision B of the Civil Code, failed to avail itself of that narrow safe harbor. But the District had a narrow safe harbor on its head. Instead, found that Volkswagen's settlements with, the class-action settlements from, from well over a year, up to two years prior, were, were enough to satisfy its obligation to make an appropriate correction during that 30-day window, as to these plaintiffs. Again, that position, ultimately, it can't be squared with the plain language of the statute, or with the cases determine, excuse me, concerning the statute. You know, Outboard Marine, one of the seminal cases on, on the CLRA safe harbor, says that in order to construe the, the terms of, or the settlement purpose of that statute, it has to be construed literally. And that was a case where it was talking about applying that, that, that literal application rule against a plaintiff, despite the fact that the statute says that it must be liberally construed in favor of consumer plaintiffs. So it makes absolutely no sense that you would, that, that it must be literally construed as against plaintiffs in a pro-consumer statute, but that it can be liberally construed, or, or, you know, substantial compliance would be sufficient for a defendant. Now, in this case, where there was also, there were also issues, leaving aside the timing problem, there were also substantive issues with the so-called offer. Again, if you look at the letters themselves, they're not offers. All they say is, hey, we've settled with some other people. It doesn't even give an opportunity to opt back in. There's nothing of that sort. And these plaintiffs, again, had already opted out long ago. But instead, but more than that, these offers, the settlement offer came with an incredibly broad release of claims. We're talking, it said, known or unknown, foreseen or unforeseen, past, present, future, any and all claims that could ever possibly be brought relating to this, this defeat device and eventual fix. Now, under California law, that cannot be an appropriate correction on a, on a CLRA damages claim. You know, all that an appropriate correction does is cut off your right to CLRA damages, but it can't be conditioned on, on waiver of other statutory rights, other common law rights, other forms of damages. And in this case, you know, Volkswagen had this, had an airtight release that was asking these, these plaintiffs to waive any and all rights. Again, under Valdez, under Flores, that's, that's simply not an appropriate correction. Mr. Corrella, I don't mean to interrupt your argument. I think you were just getting to the question I had. So I wanted to know what, what were the cases from our circuit or the Supreme Court that you think best make clear or support your position that the correction is ineffective because of a, an overly broad release provision? Unfortunately, your honor, there are no cases that we're aware of from this circuit or from the California Supreme Court. And so the parties have focused on, on two, maybe three at the California Court of Appeal. Those cases are Benson cited by the district court, as well as Valdez and, and Flores, which came just before Valdez. And the reason that the trial, the district court was wrong to rely on Benson is there's, there are a number of reasons. First and foremost, Benson was a case, as Valdez points out, decided on the substantial evidence standard of review. It wasn't construing the scope of what's allowable under the statute. It was giving a very deferential review to the trial court. And as Valdez points out that view to the extent that it can be seen as a holding that, that correction offers can be conditioned on, on the release of unrelated claims, claims outside of the CLRA. Valdez said, we, you know, unequivocally, unequivocally rejected that and said, the only thing it can be conditioned on is a release of CLRA damages. So in this case, we had Song Beverly claims, we had CLRA restitution, we had common law fraud. You know, there were a number of other claims that were not only non-overlapping remedies, but also non-overlapping bases for liability, the kind of things that wouldn't even be res judicata if, if just the CLRA were taken to, to judgment. And so for that reason, that, that, that overly broad release was not within the CLRA and, and, and really defeated that correction offer. So I have a related question then. Sure. Is this court, is our court on this record in a position, if we were sympathetic to your claim, to rule that the release was ineffective as a matter of law? Or would it most be something where we can vacate the district court's decision and remand for further proceedings in the district court? Well, because there's no dispute about the scope of the release, and it's in the record. And because the release is, was overbroad, as a matter of law, this court can rule as a matter of law that the correction offer was not appropriate. And again, it combined with the fact that the correction offer was simply made, should, I should say there was no genuine correction offer made. Most people didn't receive any kind of letter within that 30 day window. And so, you know, taking that all together, a full reversal is certainly warranted. It does not need to be remanded to the trial court on that issue. Okay, thank you. Finally, I would like to talk very briefly about the punitive damages award in this case. The jury's awarded plaintiffs each $25,000 in punitive damages. The trial court found, citing a case from this circuit, that the award that substantive due process principles required it to reduce that award to four times the damages. But a trial court's ability to reduce, to step in and disturb a jury's verdict, something that's sacrosanct in our law and under our constitution, is very limited. And the trial court is only allowed to reduce that verdict to the constitutional maximum. But in this case, involving Volkswagen's fraud, selling cars that were ranging from roughly that $25,000 amount to over $75,000, it's simply not possible to say that this was the constitutional maximum at four times, excuse me, compensatory damages. It does not raise a judicial eyebrow, and it certainly is not grossly excessive. And that's the only way that a trial court can step in. Was the jury informed in terms of its assessment of punitive damages, of what kind of penalties Volkswagen had paid in connection with all of the various suits brought against it? It was, yes. The jury was very well apprised of Volkswagen's contrition. There was plenty of evidence brought in during the punitive damages phase. But the fact that there had been punishment in other suits, was it informed of that and the ability to take that into account? That's correct. The jury was informed of other payments that Volkswagen had to make and certainly did consider that in reaching its number. That's correct. Your Honours, are there any further questions before I reserve for rebuttal? I only have one question. Yes. And I'm taking up your time, so I'll give you additional time if you need. Thank you. But the question is this. I have the recollection that the Supreme Court has raised due process concerns where punitive damages exceed a multiple on actual damages that gets in past double, gets into double digits. So I wasn't sure where the district court got the number four, where that came from to say the maximum is four times, four times damages, rather than saying nine times damages. So in this case, it came from a decision of this court called Ramirez v. TransUnion. And in that case, there were very high compensatory damages, and I believe it was five million dollars or thereabouts. And so the court found that in that case, based on the facts of the case, a four to one ratio was the maximum the Constitution allowed. Here we have a situation of very low compensatory damages. And that case and BMW and State Farm all are very clear in saying that when you have a situation of low compensatory damages, that's the sort of prototypical situation where the Constitution is not stepping in and holding you to a multiplier like four to one or even necessarily ten to one. Then in your opinion, representing the plaintiffs, what would be the maximum multiple that due process would allow? Well, given given the the low punitive damages awards in this case, I think that whatever the maximum due process will allow, these twenty five thousand dollar awards are within that amount. They do not they're not grossly excessive. They do not raise a judicial eye. And frankly, looking back at BMW, where all of these the three prongs grew out of this idea of due process requiring notice to a defendant that they would be on the hook for potentially a judgment of that award. Excuse me, that magnitude. There's just no way to say that Volkswagen had zero notice that it might have a twenty five thousand dollar punitive damages award. Thank you. Thank you. With that, I'll reserve. Dan, for your pleasure, this is Robert for Volkswagen. I tried the case below for 11 days before Judge Breyer. Let me start first with a song Beverly issue. The Ninth Circuit has held clearly that in order to have a song, Beverly violation. A product must violate the most basic fitness for ordinary use in car cases, relying for birds on birdsong for that. Yes, your honor. But did Birdsong address this other prong in in a four? Was it raised in that case? Your honor, I believe that in other cases, Birdsong applies because it's a commercial code case and we think it's relevant here. Well, they have a footnote indicating there was a song Beverly claim there, too. But it seemed to be based on the other clause. So far as I could tell, am I wrong on that? Your honor, we believe that the standard, if you look at the California cases, is one of lacking the most basic use. And if you look at the car cases, which were cited a minute ago, the Hyundai case and nobody's driven by the claims that are made in the cases. And it's there right on the face of the statute that implied warranty of merchantability means that the consumer goods meet each of the following and fit for ordinary purposes is number two. But number four is conformed to the promises or affirmations of fact made on the container or label. Your honor, there's never been a case where a product did not either have a safety issue or there was not an issue with respect to whether it fulfilled its core purpose, where where a court has ever held that a breach with respect to just the label was sufficient. And in this case, I have a case where a four was invoked and the court said, no, you you can't use that. The words are there, but we can't apply them because it's got to be fitness. Is there a case that says that there are multiple cases which hold that you have to have a labeling issue much must relate to either core fitness or safety plus cases hold the case that say that a four has to be construed as being limited to a fitness issue. Courts have courts have looked at that issue within the context of fitness. Yes. Multiple cases that we cite in our brief. In addition, courts have also said if the consumer has not looked at the label, they can't bring a claim under a four. And there's nothing in the record that these consumers ever looked at the label. The only thing that's that's a different argument. I mean, that may have some force here, but it's different from the other argument. But your honor, the cases that we've looked at and we've scoured the all the cases all hold that in a case of labeling, it still has to go to core purpose or safety. And the record here at summary judgment was that these plaintiffs had driven these cars for five hundred fifty thousand miles, including two hundred fifty thousand after the emissions issues were known. The record before the court was that the EPA and CARB said that these vehicles had no safety issues at all, could be bought and resold. The issue at summary judgment, your honor, was that there were there was a market to buy and sell the vehicles. In fact, two of the plaintiffs bought and sold, sold their vehicles post the time when the emissions issues became public. And more importantly, when you look at the cases where cars and there have been a number of them in a case involving Mercedes, the car lurched, clinked and leaked fluid. That did not occur in this case. Similarly, in the Hyundai case, there was imminent harm. The sunroof of the car would open up. In this case, plaintiff put forward no evidence at summary judgment, none on any safety issue at all. All they relied upon was the statement of facts that Volkswagen had agreed to. And that was the only evidence. And there's nothing in the statement of facts. And there's no there was never any evidence put forward at trial that these cars caused any safety issues. None of these plaintiffs have claimed a personal injury in the case. So when you look at the song Beverly cases, the law is fairly clear. You've got to show some sort of a safety issue or something going to the core use of the product. And plaintiffs had no evidence at summary judgment on either issue. In addition, as I indicated before, there's no evidence that they saw the label and the Jaguar case. California appellate 220 makes the position makes takes the position you need to show some causation. And they couldn't do that. Now, they will say, well, there were ads that were false. And that's conflating a fraud claim with a song Beverly claim. Plaintiffs had the full ability to prosecute their fraud claim before the jury. The jury awarded damages. Plaintiffs elected not to even put forward any damages expert at all. And so in the mere fact that there was a regulatory violation is not enough. There are multiple cases holding that a regulatory violation is not enough. If the regulatory violation is not one that goes to the core use of the product, there's no question that these cars were drivable and serve a transportation function. And the only defect they had at all was the emissions issue. Now, plaintiffs were able to prosecute their fraud claim. Breyer put that to the jury. They didn't put forward any evidence. And the jury reached its verdict. For five of the plaintiffs, there were no damages. Then for some of the others, there were some damages. This court in assessing the original settlement made the point correctly. We think that that the damages that were provided for in the class action settlement were more than you could even achieve in litigation. And that, in fact, turned out to be the case. So we think that on Song Beverly, the evidence and summary judgment did not show that these vehicles were not sued for ordinary use. It did not show that they were unsafe. And on the question of the label, all the cases that we've identified tie the label back to either fit for ordinary use or safety. And beyond all of that, plaintiffs cannot establish that they looked at the labels. There's nothing in the record that they looked at the labels. And courts have held that if you haven't looked at the label, you can't bring a Song Beverly claim. And they obviously could have put declarations or their testimony from their depositions. They were all deposed. None of them claimed that they looked at the label, which the plaintiff is now focusing on, which was under the hood of the vehicle. Clearly, they claim to have looked at ads. But that was a fraud claim, not a labeling claim. And they were able to bring that fraud claim before the jury. And if the court has no further questions on Song Beverly, I'll turn to the CIO. Yes, I have a question that I'm probably going to get in trouble here trying to remember back in law school because it's been a while. So you could help me out on this. But in the Song Beverly Act, to the extent that it suggests that there must be compliance with everything on the label. Is that part of the statute? We don't believe it is. We believe that that statute, as it's been interpreted by multiple courts, you've got to show something going to the core purpose of the statute. Let me give some examples. But does the literal language of the statute say that, which I took to be the implication of Judge Collins question? We don't believe that that's how courts have interpreted. And we believe that the label needs to be construed in light of the purpose of the merchantability purpose. And it's not supposed to be a claim that allows someone to bring a claim based on any defect in a vehicle. It's got to be something that goes to merchantability and merchantability, by definition, is something that goes to the core purpose of the product. So in the Thornton case, the court said it was not sufficient that the label said that a laptop was upgradeable when it was not. And of course, the court said that the laptop fulfilled its ordinary use. In the Thomas case, there are multiple cases in the food area. It was there was a failure to allege that there was added sugar in a soft drink. And the court said that was not a fundamental defect for that soft drinkers who still got the benefit of drinking the soft drink. The Vigiano case is another case where the claim was that the label said it was natural diet soda and it was not, but it was still suitable for use as diet soda. And all three of those cases and multiple more courts have held that a Song Beverly claim was not stated purely on labeling. Here we have the additional argument, which is that these plaintiffs never never claimed to have seen the label. But the law is fairly clear that in a case where you have a labeling issue, it has to relate to the core use of the product. So there's a case, Powder, involving a golf training device where someone would hit the golf ball and it would actually hit you and hurt you. That case, the label actually that was sufficient. There's another case, Sandoval, which had to do with a supposed sex enhancement pill that was right on the label and the pill had no use as a sex enhancement drug. And the court said that labeling case was one that could go forward. But there are many Song Beverly cases where there is a misstatement on a label and that is not sufficient unless the misstatement goes to the ordinary use of the product or is a safety issue. And again, there's no evidence in this record that these cars presented a safety issue to any of the consumers who use them. And so what these plaintiffs are looking for is is a windfall based on the mere fact that there was a regulatory issue and they had the full ability to try their fraud claims and they elected not and the jury ruled as it did. Now, on the CLRA claim, let me start first with the claim that somehow the timing issue was somehow an issue here. Below, and I would call the court's attention to Judge Breyer's post-trial opinion at pages 9 to 11, the claim was made that the that the notice that was made was a notice that was contained in a letter written by class counsel at the very beginning of the case in 2016. And that and that our response was was the settlement, which happened much, much later, which happened about a year later, was too late. And Judge Breyer said that that that particular argument didn't work because these plaintiffs had opted out of the class. And in any event, they claim that their CLRA notice was in their answers was a date much later, which actually came after the class action settlement was announced. Now, these plaintiffs got full notice of the class action settlement and affirmatively opted out. So what they're now saying. Is somehow we had an obligation to send a second notice to them after we got their CLRA notice. It's correct for one of the plaintiffs. They got the letter within another letter within 30 days. Another one was after that and another one did not receive the letter. We think that is form over substance. They clearly did not care about when they got the notice because they they didn't try to get back into the class. And moreover, the CLRA is focused on eliminating litigation. They had made the decision not to participate. They turned down the offer of correction. But more even beyond all that, I start with they waived the claim that they're now asserting. This was not a claim that was raised in the trial court. Judge Breyer makes no reference to it in his opinion. Again, it pages 9 to 11. The second argument that they're making is somehow about the release. We think the Benson case is correct. And in Benson, the court made it clear this is a California appellate case that merchants would never make a CLRA offer if they thought they would be so still subject to related claims. Now, the plaintiffs here were able to turn down the CLRA offer and prosecute their fraud claims, which is what they did. The Valdez case, which they cite, is a case which is clearly distinguishable because in that case, the court held that when you turn down a much broader release than in this case, which covered all claims, you couldn't even bring your fraud claim after the fact. Judge Breyer just took the position, followed the Benson case. There is nothing in the CLRA itself that bars a release. And the purpose of the CLRA is to encourage the efficient resolution of consumer disputes and no merchants would make an offer of correction knowing they were still going to be subject to litigation. Now, in this case, we know because there was a jury trial. It says an appropriate correction, repair, replacement or other remedies. The idea is that I get a product. It's it's got a problem with it. And then I say, you know, I'd like I'm going to sue under the CLRA, you know, because of this problem. And then the statute says fix the problem or say you'll fix it within a reasonable time, within 30 days. And, you know, it doesn't say anything about, well, I'll fix it, but only if I get something else on the side. And that seems to be the work of the word appropriate. And how is it appropriate to be able to ask for other things that the safe harbor doesn't give you? Well, we think, Your Honor, that the word appropriate in this context, something we have to give Judge Breyer some discretion and the other side viewed what was an appropriate offer of correction was something they said was within Judge Breyer's discretion. And in the Benson case, we think correctly. The court made the point that in order to encourage consumers and merchants to resolve their disputes, it was not inappropriate to ask for a release in exchange for, in this case, what would have been thousands of dollars. So why would it why would a merchant ever make an offer of correction knowing that if they corrected the problem, they were still going to be subject to more litigation about the specific issue or defect? Well, it would take the CLRA cause of action off the table. Correct. And in this case, what happened was plaintiffs were able to bring their fraud claim and Judge Breyer then held a bench trial with respect to the CLRA issue. And he looked at what the verdict was in the fraud claim and what economic damages the jury found. And in each case, the amount of economic damages that the jury found was in excess. In one case, the the Roberts, Miss Robertson, it was more than three times in the offer of correction of economic compensation than what the jury awarded as her economic damages. In Mr. Salter's case, it was five times as much. Just on this. So on this theory of of asking for release, that's still appropriate. Doesn't that functionally extend the safe harbor that's written only for the CLRA into all the other causes of action that don't have such a safe harbor? If someone took the offer of correction, yes, but the remedy that the that a party would have in this case would be either compensation or getting the vehicle fixed. And that's exactly what they were able to assert on their fraud claim. Now, the plaintiff says, well, we couldn't get punitive damages, but punitive damages serve a different function and compensation. And there's no question that these plaintiffs were able to seek full compensation by litigating their fraud claim. Now, obviously, they turned down the offer of correction. They opted out of a class action settlement and they were able to litigate their their fraud claim. And the jury awarded them the damages that it did. But that doesn't give them the right, we believe, to say, well, we still have a CLRA claim because we asked for a release. They turned down the CLRA claim when they opted out. And the CLRA on itself, on its face, talks about how the offer of correction must be given in a reasonable time. It doesn't have a time limit on it. The 30 day provision is certainly in it. But our position is that if you make the offer of correction and the plaintiff turns it down and then they send the CLRA letter, then you're just going to remake the same offer of correction. That really is just form over substance. And these plaintiffs. Mr. Chauffeur, I wanted to ask you a question before all your time was used up, and that's the same question I asked Mr. Giroir. That is, on the punitive damages that were awarded by the jury, at least as I understood this, unless I'm mistaken, if so, correct me, but the jury awarded a certain amount of punitive damages and the district court reduced the punitives to four times the actual damages. And I wanted to know where did the number four come from here? And why is that appropriate as a modification of the punitive damages that the jury awarded? The multiple decisions of this court, starting with the TransUnion case, where this court held in a case involving only economic harm, that four times was sufficient. The King case, 2017, four times is sufficient. The Mitry case, 2016, four times is sufficient. The Bennett case, 2007, four times is sufficient. In those cases, did they say that if you'd allowed a larger multiple than four, it would offend due process? Well, certainly in the most recent decision by this court, which is the Hardeman case, which goes out of the Monsanto Roundup case, there was a reduction in the punitive damages awarded to 3.8 to one, and the court said that that was at the outer bounds of what would be permitted under due process. So all the cases that I've cited talk about four to one in the context of economic injury. And in fact, in Hardeman, there was actually personal injury because it was a case involving alleged cancer. On the question of whether there was small damages here, and therefore the punitive damages should be higher, that doesn't make sense because they got the actual compensation and damages that the jury awarded. Nothing more, nothing less. The amounts were actually substantial in the case of the three plaintiffs who are left here. They got, you know, $1,000, $952, $582, and $3,133. State form does say that in cases with high reprehensibility and low base compensatory damages, that higher ratios might be warranted. Isn't this kind of the paradigm of that case? Because the reprehensibility is very high and the damages are relatively low. Judge Breyer recognized that this was a case at the high end of the scale on the fact that Volkswagen had paid worth of $20 billion to deal with the jury. That was my question before the jury took that into account. They were allowed to factor that in. So you don't have the objection that they that wasn't given to them to consider. So we're talking about the constitutional limit under State Farm and its progeny. But I think if you look at the cases of this court and other courts, when they look to an economic harm, it's four to one. In addition, Judge Breyer looked to the California unfair competition law, which provided for a maximum civil penalty of $2,500, and said that was a number that courts have looked at in terms of determining reprehensibility. So what these plaintiffs were looking for here, and in fact they had asked the jury for more than $500 million in punitive damages. So we believe, Your Honor, that in looking at multiple decisions of this court in a case involving solely economic harm, it's important to remember, none of these plaintiffs alleged a personal injury. Dr. Thornton, who was the only expert they put forward, had no evidence that these cars caused any health issue for anyone. And again, Dr. Thornton was not put forward at summary judgment. So the argument that was made under the Somme Beverly wasn't present for Judge Breyer. And so in a case involving a purely economic injury, four to one, as this court said in TransUnion and the other cases I've cited, touches the outer bounds of due process. And again, Judge Breyer heard all of the evidence, considered all of the evidence, and there certainly is not any case that I'm aware of in this circuit in recent years where the court has said that in a case involving economic damages, more than four to one is warranted. In fact, the cases hold the opposite. Does the court have any, if the court has no further questions, we would just urge the court to, Judge Breyer conducted a full and fair trial. These plaintiffs had a full and fair opportunity to prove damages. They did not put on a damages expert, and the jury awarded the appropriate level of damages, and then Judge Breyer reduced it. I think on the issue of Somme Beverly, multiple cases support our position with respect to labeling, and on CLRA, the issue of whether the timing of the corrective offer was waived by the plaintiff. And therefore, that issue is off the table, and they're just left with the issue of the release, and we think, as the court did in Benson, that an appropriate offer of correction clearly should involve a release because otherwise no merchant would want to be subjected to additional litigation. Thank you very much, and Judge Breyer should be affirmed in all respects. Thank you, Mr. Jofra. And now we'll return to Mr. Carolla for his rebuttal. Thank you, Your Honor. I didn't have the benefit of being in trial like Mr. Jofra, but fortunately, these issues really only involve looking at what the text of the statutes says, and the text of the statutes is very, very clear. Just a few points I want to talk about. Mr. Jofra raised the issue of reliance. They didn't look at the label. That's important because the statute doesn't contain a reliance element. Subdivision A governs the implied warranty of merchantability, nothing about reliance. Subdivision B contains the implied warranty of fitness for a particular purpose, and it contains an explicit reliance element. I mean, under California law, it's clear if there's a reliance element in one part of a statute and no reliance element in another, that means what it means. The legislature means what it says. But it's also important to note that, you know, as Volkswagen pointed out, footnote six of their brief, these substantive elements of Song-Beverly, derived originally from the commercial code, were just recast seven years later as a more consumer-friendly statute. But it's interesting to look at that commercial code section, 2314, and the UCC comment that came with it when it was enacted in 1963, and it says that adding the mislabeling component to the implied warranty, the purpose was that the general obligation of good faith, which requires that a buyer should not be placed in the position of reselling or using goods delivered under false representations appearing on the package or container, and that the obligation is imposed by the original contract not to deliver mislabeled articles. It's not reliance. It's about introducing something into the stream of commerce that the legislature has said should never have been there to begin with, and putting people like plaintiffs in the position of holding these vehicles that have fraudulently mislabeled engine blocks on them. The next, one other issue I'd like to talk about was that they did, they cited a handful of mostly unpublished district court cases rejecting mislabeling claims. For one, not one of those had anything near the deliberate fraud that Volkswagen has engaged in, but more importantly, each of them lifted, and this is very clear in our reply brief, each of them lifted out of context that quote about the core test from cases not involving mislabeling. Most of them came from DICTA in a case called Mocek, as you'll see in our brief. Finally, with regard to the CLRA, Mr. Jafra said that we were elevating form over substance, but I ask you to look at outboard marine, which says substantial compliance with that 30-day notice requirement is not enough. If it's not enough for a plaintiff in a consumer statute, then it's not enough for a defendant. He said that we waived the issue. That's not true. Plaintiffs argued that they were entitled to use the class notice letter as their notice under the CLRA. The court found other ways, found that they were judicially stopped from doing that because of their judicial admissions in their complaints. But ultimately, that same legal argument applies with full force to the facts as the court found them. The letters that we alleged in the complaints were also not responded to within that 30-day window, so there was no waiver. I'm afraid to note that you're over the time that was already extended a bit, but I want you to take another 30 seconds to respond. Thank you. One of the questions I've got is, how do you respond to Mr. Jafra's argument that on pure punitive damages claims that he thinks the Ninth Circuit precedent is consistent that in a case with economic damages that a multiple of four point times would be the maximum and 3.8 times is near the outer limit? Sure, those cases all involve very substantial compensatory damages awards. The court wasn't focused on the fact that it was just economic damages. That's simply a coincidence. In those cases, it was the fact that the awards were so large that a smaller multiple was adequate to deter. And again, it's worth noting in this case that the court found complete indifference to health and safety. That's something that BMW, the Supreme Court, discussed in the same breath as causing physical injuries. So this was extremely reprehensible behavior, and the awards were justified. Thank you, Mr. Giroir. Thank you. I want to thank Mr. Giroir, Mr. Jafra for their excellent advocacy. This is a difficult case, and we appreciate hearing from both of you. The case, unless one of my colleagues has a further question or comment, this case will now be submitted, and the advocates will hear from us in due course. So I want to again thank you. And for those of us who used to be advocates, it's wonderful to see such excellent advocacy. It makes me homesick for being able to take the robes off and stand up and argue. Yes, that's right.  Thank you, Your Honor. That case should now be submitted. And that's our last case to be argued today, after Riley has submitted the last case. Now, we have no argument. The last case on our docket was submitted on the briefs, Tucker v. Kijikazi, and the social security case on number 236063. That case is submitted on the briefs. And therefore, if Blanca would kindly bang her gavel, we will adjourn. This court for this session stands adjourned.
judges: GOULD, COLLINS, Ezra